# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20420

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2019

Lyle W. Cayce
Clerk

CHRISTOPHER EDWARD MCMILLEN, an Incapacitated Person

Plaintiff - Appellant

v.

NEW CANEY INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before BARKSDALE, STEWART, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

In exchange for federal funding of special education services, schools must provide a "free appropriate public education" to students with physical or mental disabilities. 20 U.S.C. § 1412(a)(1)(A). As part of that deal, the Individual with Disabilities Education Act (IDEA) requires administrative procedures to address disputes about a disabled student's education. If those procedures do not fix the problem, parents may file a lawsuit to assert their children's rights. But the IDEA requires exhaustion of the administrative process before a suit may be filed over the denial of a free appropriate public education. *See id*. § 1415(i)(2)(A). The exhaustion requirement is not limited to suits enforcing the IDEA. It applies to suits under any laws that "seek[] relief that is also available under" the IDEA. *Id*. § 1415(l).

No. 18-20420

We must decide whether the exhaustion requirement applies to this suit seeking damages under the Rehabilitation Act and section 1983 for a student's expulsion from high school. In answering that question, we decide for the first time in our circuit whether the IDEA's exhaustion requirement applies when the plaintiff seeks a remedy that the IDEA does not supply.

I.

Because this suit was dismissed at the pleading stage, we assume the following allegations to be true. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009.

Chris McMillen was enrolled in New Caney Independent School District from age 4 (pre-kindergarten) until early in his junior year of high school. During those years, the district developed and implemented an individualized education program (IEP) for McMillen, who had been diagnosed with autism spectrum disorder, emotional disturbance, and central-auditory-processing disorder. The program successfully managed his behavioral challenges for several years.

McMillen's behavior worsened during his sophomore year to the point that he was threatening to harm himself and others daily. The committee overseeing McMillen's IEP met three times that year. By the middle of the year, McMillen was placed in the district's Pass Program, which is for students who "have demonstrated either serious emotional disturbance or behavior disorders" and have "not responded to less intrusive interventions."

Despite the problems during McMillen's sophomore year, the district returned him to the regular school setting for his junior year. His IEP for his junior year abandoned measures, like participation in the Pass Program, that had proven successful. McMillen's parents complained about the changes, but New Caney refused to amend his IEP. The new plan was "woefully inadequate

and intentionally indifferent" to McMillen's needs.

McMillen's return to the traditional classroom put him in Margaret Hudman's English class. Hudman tried to "save" McMillen, in two senses of the word. She encouraged McMillen to take herbal supplements that she thought could cure his autism. She also tried to convert McMillen to Christianity, believing that if he converted his disabilities would be cured.

About a month into the school year, Hudman gave up and tried to have McMillen expelled. She collected material that McMillen wrote during class and their informal sessions which, taken out of context, made McMillen appear dangerous. Hudman emailed these materials to school administrators, who referred the matter to the school's police department. The police arrested and charged McMillen with the felony of making a terroristic threat. Following McMillen's arrest, the district determined that he should attend an alternative campus.

McMillen's parents eventually accepted an offer from the county attorney to drop the felony charge in exchange for their agreeing to never return McMillen to the school district. McMillen's parents believed that accepting the deal was the only option and ceased all efforts to return him to New Caney ISD.

This lawsuit followed. The original complaint asserted claims under the IDEA as well as the Constitution and Texas law. But neither McMillen nor his parents, who were suing on McMillen's behalf before he reached 18, completed the IDEA administrative process (they only invoked some preliminary procedures early on to challenge McMillen's amended IEP). After the school district raised this failure to exhaust as a ground for dismissal, McMillen amended his complaint to remove the IDEA claim. The relevant complaint is his fourth try, which asserts a Rehabilitation Act claim and an equal protection claim under section 1983. Defendants again sought dismissal

on, among other grounds, failure to exhaust. The district court granted the motion.

## II.

## A.

States receiving IDEA funding must maintain certain procedures to resolve disputes over the adequacy of a covered student's education. 20 U.S.C. § 1415(a). The procedures include: (1) the opportunity for any party to file a complaint, which forces a local education agency to hold a preliminary meeting to resolve the complaint, *id.* § 1415(b)(6), (f)(1)(B)(i); (2) an impartial "due process hearing" to resolve the complaint, which a local or state education agency conducts, *id.* § 1415(f); and (3) mediation to resolve the complaint, at the state's expense. *Id.* § 1415(e)(1), (e)(2)(D). A party not satisfied with the result of the administrative process may bring an IDEA claim in federal court. *Id.* § 1415(i)(2).

In its original form, the IDEA was the "exclusive avenue" for enforcing a disabled student's right to an adequate education. *See Smith v. Robinson*, 468 U.S. 992, 1009 (1984). So a plaintiff seeking educational accommodations for a disabled student could not sue under other laws that protect the disabled, such as the Rehabilitation Act. *Id.* at 1009, 1021. But soon after the Supreme Court interpreted the law that way, Congress charted a different course. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017) (citing Handicapped Children's Protection Act of 1986, Pub. L. No. 99-372, 100 Stat. 796 (1986)). It took the following middle ground: IDEA does not displace other laws that may help disabled children receive an education, but parties must try the IDEA's administrative process first. *Id.* In other words, a plaintiff may invoke any federal law to support a disabled student's claim for an adequate education; the plaintiff just must first exhaust under the IDEA.

No. 18-20420

The statute allowing non-IDEA claims but only after exhaustion of the IDEA procedures provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).  Because McMillen did not exhaust the IDEA procedures, his suit asserting other federal claims must be dismissed if it "seek[s] relief that is also available under" the IDEA.

## B.

The Supreme Court recently provided guidance to help us determine when a suit seeks relief available under the IDEA.  It does so when the plaintiff seeks to remedy the deprivation of the free appropriate public education that the IDEA guarantees.  *Fry*, 137 S. Ct. at 752.  The IDEA achieves its goal by providing instruction and related services tailored to the child's unique needs.  *Id.* at 755.  So complaints that a school did not adopt a plan individualized to the student's needs sound in the IDEA.  In determining whether a plaintiff seeks relief available under the IDEA, we focus on the substance of the complaint, rather than the "labels and terms" the plaintiff uses.  *Id.*

But both the substance and language of McMillen's complaint reveal that he is challenging the denial of a free appropriate public education.  McMillen treats the failure of his 2015–16 IEP as the precipitating event for all that followed his junior year.  The IEP was the district "giving up on Chris"; "abandon[ing] what had been working"; exhibiting "negligence, professional negligence and misjudgment, deliberate indifference, and malice towards

5

Chris"; and "was nothing more than Defendant New Caney ISD and the IEP Team proverbially *throwing up their hands* and declaring *we are tired of dealing with Chris-Twelve years of putting up with him is enough*." The central failing of the IEP is that it removed McMillen from the Pass Program, which "was 'designed to *work with students who have demonstrated either serious emotional disturbance or behavior disorders,*' . . . and return[ed] him to the care of professionals [who] had already proven their inability to manage Chris's Disabilities." The IEP thus was the reason McMillen was in the English class where he lasted only about a month before the behavior problems that resulted in the criminal charge. And who was responsible for the problems with the IEP? The "ARD Committee"—more IDEA lingo meaning the Admission, Review, and Dismissal Committee that Texas schools use to develop and approve IEPs. *See* 19 TEX. ADMIN. CODE § 89.1050.

The complaint does not just allege failures to comply with the IDEA when formulating the IEP before McMillen's junior year. McMillen alleges that when the district decided to send him to an alternative school, it failed to "hold an MDR." That is yet another term from the IDEA and its regulations meaning the manifestation determination review that is required when discipline results in a disabled student's removal from the school for more than ten consecutive days. 34 C.F.R. § 300.530(c), (e). Such reviews determine whether the conduct was a manifestation of the student's disability, in which case the student should receive additional support to address the behavior problems. *Id.* § 300.530(e), (f).

There is even more in the complaint that focuses on failures to provide a free appropriate public education, but these examples provide a strong flavor of the allegations that are laden with IDEA terminology. Those allegations blame what happened to McMillen on the district's failures to comply with the IDEA.

No. 18-20420

Because the face of a complaint will not always make it apparent whether a non-IDEA claim is still challenging the denial of a free appropriate public education, the Supreme Court suggested two questions that will help distinguish such claims from those asserting general disability discrimination. *Fry*, 137 S. Ct. at 756. "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school?" *Id.* Second, could an adult (a teacher, for example) have brought essentially the same claim against the school? *Id.*; *see also Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 256–57 (5th Cir. 2017) (drawing on *Fry*'s two questions). If the answer to both questions is yes—it was in *Fry* for the student suing to have a service dog with her at school—then the plaintiff is not seeking relief available under the IDEA and need not exhaust. *Fry*, 137 S. Ct. at 758.

McMillen argues that the answer to both *Fry* questions is also yes for his suit challenging his removal from the district. He compares his situation to a public library's excluding a disabled person, who would have Rehabilitation Act and equal protection claims for discrimination. So too, he contends, would a disabled adult be able to sue if a school denied the person access to the school. But describing his lawsuit as the denial of access to the school facility characterizes it too generally. *See Nelson v. Charles City Cmty. Sch. Dist.*, 900 F.3d 587, 592 (8th Cir. 2018) (explaining that a plaintiff answered the *Fry* questions at too high a "level of generality" by framing the denial of a request to enroll in online learning in a different school district as a "broken promise of non-discriminatory access"). McMillen's view would mean that any case challenging the suspension, transfer, or expulsion of a disabled student would avoid the IDEA's exhaustion requirement—after all, such discipline denies access to a school—even though the IDEA regulations provide a hearing for those very situations. *See* 34 C.F.R. § 300.530(c), (e). A more specific description of this lawsuit would include what McMillen identifies as the

7

contributing factor to his expulsion: the failure of the school to provide an education tailored to his needs that would have, among other things, prevented McMillen from being in Hudman's English class in the first place. That is a claim that McMillen would not have against the public library, nor one that a teacher would have against the school.

If any doubt remains that this lawsuit is about the denial of the education that the IDEA promises, there are two other signs. That McMillen first alleged violations of the IDEA in federal court "before switching midstream" on learning of an exhaustion defense indicates that his amended complaint is still seeking to enforce the IDEA. *Cf. Fry*, 137 S. Ct. at 757 (observing that a plaintiff's invoking the IDEA administrative procedures before abandoning them is a "sign that the gravamen of a suit is the denial" of a free public education). And in trying to fix another problem with his earlier pleadings—the failure to identify a policy that might render the district liable under section 1983—McMillen again revealed that this case is really about failures to comply with the IDEA. For proof of the district's "policy," McMillen cites a Department of Education report concluding that Texas public schools "suppress" the number of students eligible for special education services and the IDEA services they receive.

We thus conclude that McMillen's lawsuit challenges New Caney ISD's failure to provide him with the free appropriate public education that the IDEA promised him.

C.

But determining what injury McMillen seeks to remedy is only half of the question that we must decide. McMillen argues that the IDEA's exhaustion requirement applies only when the remedy that a plaintiff seeks is available under the IDEA. Because his lawsuit seeks damages, McMillen contends the exhaustion requirement does not apply. In addressing this

argument, both sides accept its premise—that damages are not available under the IDEA.  The issue is not that simple.  The IDEA allows equitable monetary rewards, such as reimbursement of expenses like private school tuition a family unnecessarily incurred in the past to provide special education services. 20 U.S.C. § 1412(a)(10)(C)(ii); *Spring Branch Indep. Sch. Dist. v. O.W.*, 2019 WL 4401142, at *13 (5th Cir. Sept. 16, 2019).  It also allows for "compensatory awards," which "are designed to provide 'services prospectively to compensate for a past deficient program.'"  *Spring Branch*, 2019 WL 4401142, at *13 (quoting *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1280 (11th Cir. 2008) (awarding a student the option of multi-sensory reading and tutor services, and a dedicated special education teacher or reimbursement for private school tuition)).  But McMillen's suit does not seek awards tied to the cost of providing him with an adequate education.  He instead seeks damages for injuries like emotional distress,[1] and such traditional compensatory damages are not available under the IDEA.  *Fry*, 137 S. Ct. at 752 n.4.

We thus must address a question most circuits have answered but this one has not: whether the exhaustion requirement applies when a plaintiff is seeking remedies not available under the IDEA.[2]  The Supreme Court declined to answer the question in *Fry*. 137 S. Ct. at 752 n.4.  Most circuits hold that the IDEA requires plaintiffs who were denied a free appropriate public education to exhaust regardless of the remedy they seek.  *See Z.G. v. Pamlico*

---

[1] McMillen's complaint also seeks punitive damages.  But punitive damages are not available under the Rehabilitation Act, *Barnes v. Gorman*, 536 U.S. 181, 189−190 (2002), or against a governmental entity for constitutional violations, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268, 271 (1981).

[2] *Doe v. East Baton Rouge Parish School Board*, 121 F.3d 705, 705 (5th Cir. 1997) (per curiam), a brief and unpublished opinion, affirmed the dismissal of a constitutional claim for damages because the plaintiff failed to exhaust IDEA procedures.  A later case stated that "demanding monetary damages—which are unavailable under the IDEA—does not automatically remove a claim from the IDEA's ambit," *Stewart v. Waco Indep. Sch. Dist.*, 711 F.3d 513, 527 (5th Cir. 2013), but that opinion was vacated, 599 F. App'x. 534 (5th Cir. 2013).

*Cty. Pub. Sch. Bd. of Educ.*, 744 F. App'x. 769, 777 n.14 (4th Cir. 2018); *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 276 (3d Cir. 2014); *J.B. ex rel. Bailey v. Avilla R-XIII Sch. Dist.*, 721 F.3d 588, 595 (8th Cir. 2013); *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 487−88 (2d Cir. 2002); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 64 (1st Cir. 2002); *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1068 (10th Cir. 2002); *Charlie F. ex rel. Neil F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991−92 (7th Cir. 1996); *N.B. ex rel. D.G. v. Alachua Cty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996); *but see Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 876−77 (9th Cir. 2011) (en banc) (requiring exhaustion when a plaintiff sought an IDEA remedy or its functional equivalent, such as money to pay for private school or tutoring, but not when seeking other damages), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc).[3]

The question may be a closer one than the circuit scorecard suggests. Although McMillen does not advance it,[4] there is a textualist case that a claim does not "seek relief that is also available" under the IDEA if the plaintiff cannot seek the same remedy under the IDEA. After all, the ordinary meaning of "relief" in the legal setting is remedy. *Relief,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (3d ed. 2002) (defining relief as a "legal remedy or redress"). Indeed, the words define each other in the leading legal dictionary. *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (stating that "relief" is "also termed *remedy*"); *id.* (defining "remedy" in part as "legal or equitable relief"). The Solicitor General took this textualist approach in *Fry*, arguing that

---

[3] The Sixth Circuit did not require exhaustion for a student who had graduated because the IDEA procedures could no longer provide him any relief. *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 917−18 (6th Cir. 2000). But it indicated it would follow the majority approach outside that unusual situation, "disagree[ing] that the plaintiff's damages claim alone excuses her from exhausting her administrative remedies." *Id.* at 916.

[4] When interpreting a statute, we are not bound by the interpretations "that the parties advocate." *See Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1353 (2015).

exhaustion is not required "[w]hen a plaintiff seeks only compensatory damages under a non-IDEA statute." Brief for the United States as Amicus Curiae at 18, *Fry*, 137 S. Ct. at 743. And the IDEA uses "relief" not just in its exhaustion provision, but also when listing the remedies available under the statute. 20 U.S.C. § 1415(i)(2)(C)(iii). Reading those provisions in sync would further support the view that "relief" means remedy.

But as we have noted, most courts read the statute differently. They read "relief available" under the IDEA "to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." *Charlie F.*, 98 F.3d at 991–92. According to this view, because the IDEA can remedy the failure to provide a blind student with a reader by giving her one, a suit seeking damages for such a failure must first exhaust the IDEA's administrative procedures. *Id.* at 992.

We agree that such an approach is necessary to enforce the statutory scheme, under which "educational professionals are supposed to have at least the first crack at formulating a plan to overcome the consequences of educational shortfalls." *Id.* Allowing a plaintiff complaining about the denial of a free appropriate public education to avoid exhaustion "merely by tacking on a request for money damages" would subvert the procedures Congress designed for prompt resolution of these disputes. *Polera*, 288 F.3d at 487−88; *accord N.B. ex rel. D.G.*, 84 F.3d at 1379. The statutory preference is to solve these disputes by providing the student with her promised education, not by awarding damages years after the problem arises in the classroom. *Polera*, 288 F.3d at 490.

Most other circuits addressed this issue pre-*Fry*. Although *Fry* did not answer this question, its broader reasoning on the exhaustion requirement tends to support the majority view. Interpreting the IDEA to prevent parties from circumventing the scheme that Congress established in section 1415(l)

through clever pleading was central to *Fry*.  137 S. Ct. at 755.  And the Supreme Court's test for exhaustion—whether the lawsuit seeks a free appropriate public education—comports with reading "relief" to focus on the conduct the plaintiff complains about.  *Id.* at 752.

We therefore hold that the IDEA's exhaustion requirement applies to plaintiffs who seek damages for the denial of a free appropriate public education.  Because McMillen did not first seek relief through the IDEA administrative process, this lawsuit was properly dismissed.

\* \* \*

The judgment is AFFIRMED.